**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA**
    **Plaintiff**

        **v.**                                    **Criminal No. 05-047 (CCC)**

**JOSE R. LUGO GUERRERO (1)**
    **Defendant**

**MAGISTRATE-JUDGE'S REPORT AND RECOMMENDATION
ON MOTION TO SUPPRESS**

I.      **Procedural and Factual Background**

    A.      **Procedural Stage**

On February 16, 2005, the Grand Jury returned a two count indictment charging defendants José R. Lugo-Guerrero (hereafter "Lugo"), Oscar Sosa-Delgado (hereafter "Sosa") and Alexander Guzmán-Del Valle (hereafter "Guzmán") with violations to Title 18, United States Code, Sections 2113(a), (d) and 924(c)(1)(A)(ii) and (2). All three defendants are charged in both counts of the indictment.

Count One charges and alleges that on February 11, 2005, the defendants, "aiding and abetting each other, did take by force, violence or intimidation, from the person or presence of the bank tellers, and others" and while at the Banco Popular de Puerto Rico, Aguas Buenas Branch, the approximate sum of $8,716. These sums were insured by the Federal Deposit Insurance Corporation (FDIC). It is further alleged that during the commission of the offense; the defendants "did put in jeopardy the life of persons by using a firearm".

In Count Two the defendants are charged for aiding and abetting each other in carrying firearms during the commission of a bank robbery, which is a crime of violence. Specifically, within Count Two the weapons are described as "a pistol .40 caliber, Glock Serial No.

CBX773US and a pistol .45 caliber, Taurus Millennium, with an obliterated serial number." (**Docket No. 8**).

On August 1, 2005 defendant Lugo moved for the suppression of defendant's statements, "the Interstate Nexis for the firearms, the certification of payment for the FDIC insurance..." and video recordings. Defendant based his request on the fact that the government had disclosed such evidence, after the discovery deadline. (**Docket No. 58.**) The Court denied defendant's request on August 15, 2005 (**Docket No. 66**).

Also, on August 1, 2005, defendant Lugo filed a "Motion in Limine to Prevent the Government from the Introduction of F.R.E. 404(b) Material Due to Its Late Disclosure, Its Admission Provoking Excessive Collateral Litigation, and for Being Obtained in Violation of *Miranda vs. Arizona*" (**Docket No. 59**.)

The government opposed defendant's request in two different pleadings; one addressing the issue of "late production" and the second, addressing the use of F.R.E. 404(b) evidence (**Docket Nos. 64 and 65**).

On August 10, 2005, the matter was referred for disposition (**Docket No. 63**.) An evidentiary hearing was held on August 30, 2005 at which the government introduced the testimonies of José A. Alvarado, an Officer from the P.R. Police Department assigned to the Bank Robbery Division and Luis Sosa, P.R. Police Officer assigned to the FBI Task Force (**Docket No. 72**: Minutes).

### B.    The Parties Contentions

The record reflects that on July 29, 2005, the government provided the defense with notice of its intent to introduce into evidence defendant Lugo's post arrest statements, in which he admitted not only his participation in the offense charged but also admitted to his

participation in two prior bank robberies. Lugo provided the details regarding each bank robbery, this to include his and his co-participant's role, the planning and how the money was shared among co-participants. (**Docket No. 57**).

Defendant Lugo seeks to have such confession or statements suppressed asserting that its admission: (a) would require extensive collateral litigation and (b) that the same were obtained in violation of the principles enunciated in *Miranda v. Arizona*.

In support of its allegations defendant asserts that such evidence was disclosed just three (3) days prior to trial[1], fact that would compel the defense, in a short period of time, to investigate such criminal conduct and possible defenses to the same[2]. In essence, defendant Lugo asserts, that even though not formally accused of such conduct, he will be compelled to defend from "three bank robbery cases".

Defendant Lugo also contends that on February 11, 2005, after arrest, he was interviewed twice by law enforcement agents and that any statement provided was secured in violation of his Miranda rights (was not properly "Mirandized"), that his failure to sign the Waiver of Rights Form must be construed as an invocation of rights and that law enforcement agents failed to honor his request for assistance of counsel (**Docket No. 59** at p. 3-6). Regarding a second statement provided by defendant, it is alleged that the same is the product of a "confusing" admonishment of rights, that defendant "did not renegade" on his request for

---

[1]The issue of whether discovery was timely or not and any related allegations (i.e. prejudice) are **MOOT** in view of the fact that the trial was continued and defendant has been allowed to investigative and cross-examine government's agents in regards to the manner in which defendant's statements were elicited.

[2]This contention appears to be misplaced because the central or main issue regarding this evidence remains to be whether defendant's statements were voluntary or not.

counsel and that the statement obtained violates the doctrine in *Missouri v. Seizer,* 124 S. Ct. 2601 (2004).

The remedies sought by defendant Lugo are: (a) for the District Court to grant a continuance to investigate the prior bank robberies and (b) that the "admissibility of the 404(b) material be determined before trial" (**Docket No. 59**, p.13; pp. 42-44.)

The government opposed defendant's motion in all aspects. While admitting it had disclosed some evidence after the discovery deadline, it pointed to the fact that such evidence was not under its control and custody until and after such date. Nonetheless, the government highlights defendant's omissions for not acknowledging that on February 23, 2005 and March 9, 2005, it had disclosed: "(25) separate items including certification of the bank loss, photographs from the bank's surveillance videos, Miranda rights advisement and evidence reflecting that defendant had made a statement to law enforcement officers." Any subsequent disclosure, the government argues, included evidence which was "collateral" to the one initially disclosed (**Docket No. 65**).

In addressing defendant's arguments under F.R.E. 404(b) the government asserts:

   (a)   F.R.E. 404(b) is a rule of inclusion, emphasizing the admissibility of other wrong acts.

   (b)   The proffered evidence is substantially identical to the criminal conduct charged (bank robbery) and serves to prove "motive, intent, preparation, plan, knowledge and/or absence of mistake or accident".

   (c)   Admission of such evidence will not unduly prejudice the defendant inasmuch as, defendant can avail himself of any pertinent limiting

instruction to the jury and defendant has had reasonable time to prepare

for trial.

(**Docket No. 64**, p. 2-3)

II.     **The Evidentiary Hearing**

A.     **Factual Determinations**

At the evidentiary hearing the government introduced the testimony of Agent José Alvarado Rivera (hereafter "Agent Alvarado"), a Puerto Rico Police Officer assigned to the Commonwealth of Puerto Rico Bank Robbery and Fraud Division.  Also Agent Luis Sosa (hereafter "Agent Sosa"), a Puerto Rico Police Officer, assigned to the FBI Task Force Violent Crime Squad.

Defendant José Lugo-Guerrero (hereafter "defendant Lugo" or "Lugo") also testified. From their testimonies, the facts deserving credence are as follows:

Agent Alvarado, who has performed as a law enforcement agent for over eight (8) years testified that on February 11, 2005 he was on-duty assignment at the Puerto Rico Police Headquarters.  Over the radio he was informed there was and on-going bank robbery at the Banco Popular, Aguas Buenas Branch, that three armed individuals were being chased by state police officer in motorcycle.  These individuals had allegedly robbed the Aguas Buenas Bank Branch and were headed south towards the highway, had exited close to the town of Cidra and got once again in the highway as if directed towards Humacao.  By the time Agent Alvarado managed to encounter fellow law enforcement officers, the individuals had been detained and arrested.  Agent Alvarado was assigned, along with his partner identified as Agent Cruz, to travel to the Caguas Police Station and take the detainees under his custody.  Once there, agents Alvarado and Cruz took custody of defendant Lugo, whom Agent Alvarado identified in

open court. Agent Alvarado testified that in the process he witnessed how defendant was being advised of this constitutional (Miranda) rights by fellow agent Cruz.

The admonishment of rights took place at an enclosed area, a room with four or five benches where other police officers were present. The meeting with defendant began at approximately 11:00 a.m. and reportedly, lasted "a few minutes, maybe two minutes." Agent Alvarado testified that at the time, defendant Lugo "looked all right, was quiet, not nervous and had no physical injuries." The objective of such interview was to have Lugo advised of his rights. Preliminarily, Agent Cruz inquired from Lugo whether he had used drugs, alcohol or medication on that date. Lugo responded in the negative. Also the agents ascertained that Lugo could read and write. Thereafter, Agent Cruz read to Lugo from a "police form" (Exhibit 1)[3] the Miranda Rights. The document was given to Lugo for him to read and review. Once Agent Cruz corroborated that defendant Lugo understood his rights, Lugo proceeded to sign the document, acknowledging having been advised and that he understood his rights[4].

Thereafter, defendant Lugo was asked whether he wanted to provide a statement and defendant answered in the negative. At that point, Agent Alvarado assures no further inquiry was conducted. At the time, Agent Alvarado had been advised that the Federal Bureau of Investigation Task Force (FBI/TF) was to assume jurisdiction in the case. The interview with defendant Lugo concluded at approximately 11:05 a.m., time that is reflected in Exhibit 1, as consigned by defendant Lugo[5].

---

[3]The English translation of Exhibit 1 appears at Exhibit 1A.

[4]Defendant Lugo admitted during his testimony that he read the Warning of Rights Form, asked questions that were answered for him and that he understood fully his rights and the admonishment given.

[5]Defendant Lugo admitted that he had written his name/signature and time within Exhibit 1.

Agent Alvarado provided assurances that at all times, defendant Lugo was aware he was under custody, and had understood his rights as an arrestee and suspect of a crime. In accordance therewith, defendant signed the upper portion of Exhibit 1 (Acknowledgment of Rights) and did not signed the lower section (Waiver of Rights.) More so, Agent Alvarado testified, in no unclear terms, that while defendant decided not to waive his rights, he never asked for the presence of or to be assisted by counsel.

When defendant Lugo was to be transferred to Federal custody, he was encountered by FBI/TF Agent Luis Sosa. Agent Sosa has been a Puerto Rico Police Officer for ten (10) years of which, during the last five (5) years he has performed at the FBI Task Force. On February 11, 2005, fellow police agents Cruz and Alvarado transferred to him the custody of defendant Lugo. This took place at the GSA Center located in Guaynabo where the Violent Crime Squad has its offices. Agent Sosa reports that defendant Lugo was escorted to an interview room that is approximately 12x12 in size, has no windows but has excellent fluorescent illumination, has air conditioning, a desk and several comfortable chairs. At the room, besides himself and defendant were two other agents. Defendant was handcuffed (one hand) to his chair. Agent Sosa testified that the interview began approximately at 3:00 p.m.[6] and lasted approximately two hours. While defendant Lugo was offered a meal he declined and only accepted "chips and soda". Defendant Lugo was told he could go to a restroom if he wanted to. Defendant Lugo at the time appeared to be in good health. Agent Sosa indicated he proceeded to "create rapport" with defendant by engaging in basic exchange or conversation. While asking defendant his personal biographical and family data, Agent Sosa was also able to assure himself

_____

[6]The Waiver of Rights Form (Exhibit3) reflects that the interview began at 2:52 p.m.

that defendant was aptly and coherently following the conversation.  Actually, Agent Sosa observed that defendant Lugo had teary eyes, even cried and displayed remorse by stating that his father and wife did not deserve what he was doing.  He regretted having lied to his wife by telling her he had a job when he did not.  More so, Lugo alluded to his father being a Reverend or Pastor in a church and Lugo knew his conduct was not acceptable.

Agent Sosa indicated that once he felt confident of defendant's "rationality" he proceeded to read him his right.  Agent Sosa began by asking Lugo if he understood English. Since the response was in the negative, Agent Sosa obtained a Spanish version of the Warning of Rights Form (Exhibit 3)[7].  The same was read to defendant "line by line, sentence by sentence".  The defendant was given the Form (Exhibit 3) and was allowed to personally read it "line by line" and initialed each one acknowledging in such a way that he had read and understood it.  At the time someone identified as José Rosa, an Investigator from the Bank Robbery Division was present.  Reportedly, once he concluded reading and explaining to defendant his rights, Agent Sosa asserts he stressed the last sentence in the document which is the one alluding to the waiver of the rights initially enumerated.  Defendant acknowledged he understood and proceeded to sign the Warning/Waiver of Rights Form (Exhibit 3).  Then, Agent Sosa asked defendant; "what had happened during the day of February 11."  Asserting he wanted to end with his criminal activity, defendant Lugo proceeded to narrate how in the morning hours of February 11, 2005 he proceeded to meet with two other individuals, and because of their economic needs, they traveled around looking for a place to rob.  For such robbery, act upon which they had agreed upon, a person named Alex or Alexander was to

---

[7]Exhibit 3A, on record, is the English version of the Spanish Warning of Rights Form.

provide the weapons.  Since they did not have an exact location identified they went to the Caguas area.  There, Lugo out of desperation; wanted to intervene and take money from a drug point, but was persuaded of not doing so by his associates.  Then, they spotted a jewelry store in Caguas but considered it was a difficult task.  Then they drove by the Banco Popular, Aguas Buenas Branch and since  there was no police officer or security guard around they decided to enter the bank.  Alex parked the vehicle nearby and Lugo, along with the third individual (Oscar) went inside the bank.  Both were carrying handguns.  Lugo indicated that his role was to be in-charge of the people and announce the robbery and Oscar was to jump the counter and take the monies from the tellers.  Reportedly, Lugo admitted to Agent Sosa he was in-charge of the planning.  Lugo continued to provide all details concerning the get-away process, the pursuit by police officers and their subsequent arrest.

When asked to describe defendant Lugo's demeanor and attitude at the moment, Agent Sosa indicated defendant was "lucid, perfectly lucid and repentant."  Actually, Agent Sosa indicated he believed Lugo was then being truthful.  Agent Sosa described that although defendant provided this information in almost a narrative fashion, whenever he had a doubt, he asked for clarification and defendant voluntarily answered and continued to provide his narrative statement.  Agent Sosa made clear that defendant never stopped or asked to stop giving a statement and although advised twice of his right to counsel, never asked for the assistance or presence of counsel.  Actually, defendant reinstated he wanted to stop his criminal conduct because his family was very religious and well respected in the community and "did not deserve it."

Agent Sosa further indicated that once defendant concluded to provide information on the Banco Popular robbery, he asked Lugo, in general terms, whether he had participated in

any other bank robberies.  Lugo responded in the affirmative and proceeded to narrate his

participation in the robbery of Banco Bilbao Vizcaya at Los Colobos, Carolina, Puerto Rico.

Thereafter, Agent Sosa admitted to Lugo they had him as a suspect in that case and had

surveillance pictures, taken thru the bank's security system.  Defendant examined the pictures

and identified himself within.  Lugo provided details regarding the planning, execution and

the sharing of the robbery proceeds and clarified that for that robbery, he had not acted as the

leader.

Thereafter, defendant Lugo proceeded to provide similar details regarding a third bank

robbery.  This had taken place at the Doral Bank located at Roosevelt Avenue.

Though repeatedly cross-examined on the issue, Agent Sosa was emphatic on the fact,

that at least twice, they had warned defendant about his right to counsel and that at no time

did Lugo ask for legal representation.  Actually, Agent Sosa believed he was being truthful in

his statement, his demeanor was that of repentance and insisted on the fact he wanted to end

with  his criminal actions because of his family.  Agent Sosa further clarified through his

testimony that no specific promises of leniency were made (except that his cooperation was

to be considered.)  Defendant's statements were reported by Agent Sosa within a six page 302

Form or Report of Investigation (See: Government's Exhibit 4 and 4A: Spanish and English

Versions). Agent Sosa clarified that had Lugo asked for legal representation the conversation

was to be immediately concluded and only personal data would have been gathered.

Additionally, Agent Sosa indicated he would have so consigned in his "302 Report of

Investigation."

In cross-examination Agent Sosa was specifically examined regarding the different

Formats with the Warning and Waiver of Rights, as depicted within Exhibit 1 and Exhibit 3.

Agent Sosa clarified that as a state police officer assigned to the FBI's Task Force he was completely familiarized with both.  He described that while Exhibit 1 (used by state police officer) has separate sections for the acknowledgment and waiver or rights, demanding signatures under each section; the FBI Form, is a joint document.  This means, that with one signature the individual may both, acknowledge and waive his rights.  While asserting that he doubted a law enforcement agent would dare to trick a defendant into a waiver, Agent Sosa stressed he was very cautious about it.  Agent Sosa explained he carefully explained the waiver statement to defendant Lugo and that when defendant specifically waived his rights, Lugo was asked to sign.  While defendant was read his rights, Agent Sosa asked defendant to put his initials next to each paragraphs.  In this fashion, Agent Sosa asserts, he was totally convinced, defendant had done both, acknowledged each right as read to him and waived his rights afterwards.  Because of this, when asked by defense counsel if a defendant's failure to sign a waiver (as in Exhibit 1) meant defendant was actually exercising and demanding those rights; or whether Exhibit 3 was confusing, Agent Sosa responded in the negative.

The third witness testifying at the evidentiary hearing was defendant Lugo.  While significant effort was displayed in establishing that defendant, while at the Caguas Police Headquarters, had refused to waive or sign the waiver of rights, the un-rebutted fact is, that at such time, defendant gave no incriminating or exculpatory statement.  In regards to the events transpired in Caguas, defendant Lugo admitted he was advised of his rights, that Agent Alvarado and Cruz answered all questions posed by him and admitted he fully understood his rights, including the fact that information elicited could and was to be used against him.  Then he decided not to waive his rights.  It is of significance, that at no time did Lugo indicate on his

direct examination, having asked for an attorney while under state custody in Caguas.  In cross-examination Lugo stated having asked for an attorney.

Nonetheless, defendant Lugo asserts that once taken to the FBI' offices and advised of his rights, he asked at least twice, for counsel to be present.  In response to his first petition, Lugo contends that the agents replied "we are your attorneys now."  Then, Lugo reports he asked them for identification and that all present showed him an identification tag with their pictures and names but indicted "he could not see more".  Defendant Lugo testified on direct examination that he ended discussing the facts of the case because "there was a person, named Mario, who kept walking in and out of the interview room that kept telling [I] had to testify in regards to what had happened."

Defendant Lugo described he was being addressed by "Mario" in a "loud", "insistent" tone of voice, while standing to his left and that he felt "nervous", "pressured" and "a bit intimidated" but had "no desire" to waive his rights.

Curiously, regarding the admonishment of rights by members of the FBI/TF, defendant Lugo coincides with Agent Sosa on the fact that the rights were read to him, he personally read each right outlined at Exhibit 3 and placed his initials next to each acknowledging so, and accepts he fully understood such rights.  He further acknowledged having signed Exhibit  3. In cross-examination defendant Lugo admitted that "Mario" was not within the interview room at all times; and that no promises were made to him by the interviewing agents.  Lugo asserts he was informed by Agent Sosa that they had "a lot of evidence on him", that he could spend a long time in jail and that at some point, Agent Sosa placed a book with photos on the table and indicated they were to talk about the Banco Bilbao Vizcaya robbery.  Defendant Lugo concluded his testimony by stating that although no specific promises were made to him, he

ended providing a statement "because there was a lot of evidence against him and otherwise, he would serve more years in jail."

### III.    **Legal Standard and Analysis**

#### A.    **Miranda Warnings**

In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Unless the government shows that the proper warning[8] and waiver were given, any statements made by the accused are inadmissible in evidence.  Therefore, for a defendant to make out a claim under *Miranda*, "his statements must be the product of custodial interrogation."  *United States v. López*, 380 F.3d 538, 545 (1st Cir., 2004).  The custodial element is satisfied if defendant is under arrest. *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir., 1996).

It is clear and a well settled legal principle that a defendant may waive his rights under *Miranda*, 384 U.S. at 444.  Consequently, a statement obtained by government agents as a result of custodial interrogation must be suppressed unless the government can demonstrate that the defendant was properly advised of his rights and that he voluntarily, knowingly and intelligently waived those rights.  *United States v. Palmer*, 203 F.3d 55, 60 (1st Cir., 2000).

With regard to the voluntariness of a waiver, "[t]here is obviously no reason to require more in the way of 'voluntariness' inquiry in the *Miranda* waiver context than in the

---

[8]In *Miranda*, the Supreme Court stated that the following is required: "[prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444.

Fourteenth Amendment [due process] context." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986).

For a Miranda waiver to be voluntary knowing and intelligent, it must be "the product of a free and deliberate choice rather than intimidation, coercion or deception and must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Turbine*, 475 U.S. 412, 421 (1986). This inquiry requires consideration of the "totality of circumstances surrounding the interrogation."  However, the suspect need not "know and understand every possible consequence of a waiver of the 5th Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987). Rather, he need only be aware that "he may choose not to talk to law enforcement officer, and to talk only with counsel present, or to discontinue talking at any time." *Id*.  In adhering to said legal principles, a statement is not considered involuntary unless it is procured by police coercion or trickery. *Colorado v. Connelly*, 479 U.S. at 167 (1986), *accord*, *United States v. Bram*, 145 F.3d 405, 407 (1st Cir. 1998); *United States v. Santos*, 131 F.3d 16, 19 (1st Cir., 1997).

Whether defendant has validly waived his rights is a question to be determined by examining the totality of the circumstances in which said statement was secured.

    1.    **Defendant's Statements**

Counsel for defendant in seeking suppression raises three different arguments.

First, that defendant was not properly warned of his rights and consequences of his waiver.  Second, that defendant's refusal to waive his rights, once initially warned amounts to an affirmative exercise or claim of such rights.  Defendant Lugo, through his testimony, appears to add a third claim, that any statement elicited was the product of intimidation or coercion.

In the case at bar, there is not doubt that on February 11, 2005 at approximately 11:00 a.m., defendant   Lugo had been arrested and was at the Caguas Police Headquarters, under custody.  It is also undisputed that while under custody, he was properly and adequately advised of his Miranda Rights.  This fact defendant acknowledged entirely through his testimony and by signing Exhibit 1.  It is beyond dispute as well that at the time, defendant Lugo did not waive his rights and refused to sign the waiver section within Exhibit 1.

Through cross-examination Lugo asserts having requested for the assistance of counsel. The evidence on record, under the totality of circumstances analysis, shows he did not.  First, Lugo admitted that while properly warned of his rights, being this his first time under arrest, he posed questions to the police agents, securing further advice.  The agents complied with their duties and answered questions to Lugo's satisfaction.  As per Lugo's testimony, he then knew he had a right to counsel, to remain silent and that any evidence obtained was to be used against him.  Actually, then he elicited no statement.  Any assertion suggesting he invoked his right to be assisted by counsel appears to be the product of hindsight.

Hours later, evidently, Lugo's attitude had changed.  He had already begun to perceive the possible consequences of his actions (years in jail), began to feel remorse and was thinking of his father, wife and relatives, had teary eyes and even cried.  While these factors may have served to prompt or make him amenable to engage in a conversation with FBI/Task Force Agent Sosa, there is no doubt either of the fact that Agent Sosa, prior to any interrogation, proceeded to advice Lugo of his Miranda Rights.  He did so, by reading the rights in Spanish, allowing defendant Lugo to read these later on, and asking Lugo to place his initials next to each paragraph acknowledging he had understood each right (See Exhibit 3).

It is of great significance that by then, Agent Sosa had ascertained defendant was coherent, in good health, have had something to eat, was not under the influence of drugs and appeared "very lucid". The evidence shows that Lugo was addressed by Agent Sosa, in Spanish, that Lugo has high school education, he admitted not to be under the influence of drugs or alcohol, at all times appeared to be responsive. cooperative and alert.  This is further corroborated by the testimonies of Agent Alvarado, Agent Sosa, the Report of Investigation (Exhibit 4), the Acknowledgment and Waiver of Rights Form (Exhibit 3) wherein defendant Lugo placed his initials next to each paragraph and more so, by defendant Lugo's statements in court.

Defendant Lugo alleges he was pressured and a "bit intimidated" by "Mario", reportedly, another law enforcement agent within the interview room.  However, aside from defendant's testimony, no other evidence was produce by defendant in this regards and such allegations are not supported by other evidence on record.  It is clear that at all times, it was Agent Sosa the one conducting the interview.  Also, based on defendant's testimony it is clearly shown that Mario was not continuously present within the interview room .  The evidence also shows that at no point did defendant alert Agent Sosa that he felt pressured to confess.  Rather, he stated to be repentant, regretted the predicament in which he had placed his family and when realizing there was overwhelming evidence against him, he opted to be cooperative and gave a statement.  There is no evidence on record, indicating Lugo was not aware of the choice then made nor of its consequences.

Lastly, defendant Lugo asserted at the evidentiary hearing that he had requested for legal assistance.  This appears to be an allegation raised at hindsight inasmuch as, he did not make such request while in state custody in Caguas and did not do so while in federal custody, as

repeatedly stated by Agent Sosa.  Defendant Lugo's assertion in this regard, is not credible.  As per Agent Sosa's testimony, defendant Lugo was not subjected to heavy interrogation but rather provided a narrative statement with a vivid depiction of events that had transpired prior and after the actual bank robberies.  He impressed the law enforcement agents and so did portray himself at the evidentiary hearing as someone who understood the proceedings and was calmed and coherent.  Lugo accepts that he understood his rights as explained to him by Agents Cruz and Sosa.  Actually, Lugo asserted that the second time he had "understood his rights as when initially warned."  Thus, Lugo understood he had a right to counsel, to remain silent and knew that evidence obtained could be used against him.

From Lugo's brief testimony at the evidentiary hearing, it is not clear, whether defendant Lugo actually intended to assert he was under the impression that Agent Sosa and the persons interviewing him were attorneys.  While defendant asked the interviewers for identification, the setting in which he was, allowed no space for such an unreasonable inference.  It is clear from the record that defendant knew he was transferred to the FBI offices and that he also knew where he had been taken, while escorted by state police agents.  Thereafter, as per Lugo's testimony, it appears he was escorted into a room while handcuffed and Agent Sosa introduced himself, as a law enforcement agent.  The place where the interview was held and the fact that two other individuals were present, as witnesses to the process was quite foretelling.

Accordingly, considering the totality of circumstances above, it is determined that the statements provided by defendant Lugo regarding the Aguas Buenas bank robbery (and the Carolina and Hato Rey, as well) were knowingly, intelligently and voluntarily given and as such are admissible.

**B.      Whether Refusal to Waive Miranda Rights Amounts to Invocation of Rights**

In the case at bar, there is no doubt that when initially advised of his rights (by Agent Cruz) at 11:00 a.m., defendant Lugo refused to sign the written waiver of rights.  It is equally clear that no further custodial interrogation was held and actually, defendant gave no statement.  It is the agents' contention that defendant never asked for counsel and that his custody was subsequently transferred to the FBI.  Thereafter, FBI/Task Force  Agent Sosa, interviewed with Agent Cruz.  While doing so, Sosa was informed that defendant had refused to waive his rights but had not requested counsel.  Thereafter, Agent Sosa proceeded, once again to warn defendant Lugo of his Miranda rights, defendant did sign and waive the same and gave a statement admitting to the offense charge and two prior bank robberies.

Defendant asserts that when initially advised of his Miranda rights he refused to waive these and as such, law enforcement agents were compelled to construe such actions as an invocation of rights and were further compelled to discontinue interrogation.  Defendant relies in *United Sates v. Van Dusen*, 431 F.2d 1278 (1st Cir., 1970), *United States v. Boyce*, 594 F.2d 1246, 1250 (9th Cir., 1979), *United States v. Heldt*, 745 F.2d 1275 (9th Cir., 1984).

It is the defendant's contention, that the refusal to sign the Waiver of Rights Form coupled with the request for counsel, "has to be construed as a desire not to waive his rights, and requires the suppression of the statements." (**Docket No. 59** at p. 10).

Defendant's argument is misplaced.  While true that the government has the burden of establishing that a defendant has knowingly and voluntarily waived is Miranda rights, whether such waiver has actually materialized is contingent to an examination of defendant's conduct.

In *Van Dusen*, FBI agents were interrogating a suspect.  In doing so, they provided him with a form containing two sections, entitled "Your Rights" and "Waiver of Rights."  The form

was not read to defendant but rather defendant was allowed to read it.  While defendant stated he understood his rights and was willing to talk, he refused to sign the form on either section. Defendant later asserted that he understood that given his refusal to sign the waiver, his statements could not be used against him.  Five months later, when Van Dusen asked to talk to FBI agents, they refused to do so, until the form was signed.  This scenario is clearly distinguishable from the case at bar.  Still the appellate court in *Van Dusen* recognized that the *Miranda* decision, and its progeny does not require of a written waiver of rights.  *Id* at p. 1280.

While defendant may ably argue that refusal to sign a waiver may implicate invocation of his Fifth Amendment right, such refusal may not be construed as an automatic invocation or exercise of, for example, his Sixth Amendment right to counsel.  In *United Sates v. Speaks*, 453 F.2d 966 (1st Cir., 1972) the court faced a defendants' argument that while refusing to sign the waiver of rights section, he acknowledged understanding his rights and provided a statement to Secret Service Agents.  The appellate court, in admitting defendant's statements concluded that defendant had validly waived his right to counsel and remain silent "even though he did not sign the waiver form, where he stated that he fully understood his rights and wanted to speak with investigating officer, and the officer spent about ten or fifteen minutes with defendant to insure that he fully understood his rights before proceeding with questioning." *Id*. at 966, 969.

The criteria thus, is not one of automatic exclusion of a statement that follows a defendant's refusal to sign a waiver of Miranda rights.  While courts are to "indulge every reasonable presumption against a waiver of fundamental constitutional rights" *Johnson v. Zerbst*, 304 US 458, 464 (1938), the government bears the burden of establishing that the

defendant made a knowing and intelligent waiver of his right to remain silent.  *See*: *United States v. Boyce*, 594 F.2d 1246 (9th Cir., 1979).  As discussed in the preceding section, this burden the government has satisfied.

The Court in *Boyce* while recognizing that "under some circumstances, declining to sign a Miranda waiver form will be assertion of right to silence" it also recognized that such refusal to sign a waiver form may be followed by a waiver of a defendant's Fifth Amendment rights. Whether the waiver is valid is to be determined from the circumstances of the case and the scenario under which such waiver was procured.

Based on our previous discussion regarding the propriety of the admonishment of Miranda rights (Part II, Section A) this Magistrate-Judge is compelled to determine that Agent Sosa met his legal burden of securing a valid waiver of defendant Lugo's rights.   This determination is based on the following:

(a)    Agent Sosa re-admonished defendant of his rights by having the Rights Form read to him "line by line, sentence by sentence" and having defendant's initials affixed next to each paragraph after having given defendant Lugo reasonable time to review, by himself, each.

(b)    The interviewing agents devoted approximately between 10 to 15 minutes in securing that defendant Lugo fully understood his rights.

(c)    Agent Sosa insured defendant was in good health, was not intoxicated, knew how to write and read and provided to him a Spanish version of the rights.  Actually, defendant Lugo acknowledges he fully understood his constitutional rights and was aware that any evidence obtained by the

agents could and was to be used against him.  He testified accordingly at the suppression hearing.

(d)     Once we examine the Admonishment/Waiver of Rights Form (Exhibit 3 and **Docket No. 59**, Exhibit IV) it is clear that defendant affixed his initials next to the paragraph in which he acknowledged understanding his rights and willingness to answer questions and later on, proceeded to sign the Form.  The structure of the form within Exhibit 3 (regardless of how confusing defense counsel may considered it) coupled with the manner in which it was explained to defendant by Agent Sosa, clearly reflects, there was no opportunity for defendant being confused, misguided and much less, tricked into waiving and providing an incriminating statement.

(e)     Defendant articulated numerous reasons why he wanted to provide a statement and procure to end his criminal conduct.  Whether he felt repentance and shame and even feared incarceration, all factors creating emotional distress; these does not amount or equates to the psychological coercion making suppression warranted.  Actually, Lugo has demonstrated that he was fully able to assert (as he did the first time with Agent Cruz) his right to silence when he chose to do so.  *See: Boyce*, supra at 1250 (agents may ask question on personal matters and even appeal to his loyalty to his country and to his family and may even invite suspect to consider whether it will be to his advantage to discuss whatever is on his mind.)

### C.     F.R.E. 404(b)

Rule 404(b)[9] of the Federal Rules of Evidence reads as follows:

> **Rule 404.     Character Evidence Not Admissible to prove Conduct; Exceptions; Other Crimes.**
>
> (a)     ...
>
> (b)     **Other Crimes, Wrongs, or Acts.**—Evidence of other crimes, wrongs, or acts  is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Defendant challenges the admission of evidence regarding prior wrongs, acts or crimes alleging it will be prejudicial given the trial's proximity[10] and will require the defense to engage in further investigation.  This allegation is construed as one of prejudice.

The record reflects that the government provided notice to defendant on its intent to use Rule 404(b) evidence on July 29, 2005 (**Docket No. 57**).  Therefore, notice has been given prior to trial.  The evidence disclosed to defendant, more so, after the evidentiary hearing consist of a detailed description of the prior illegal conduct to which defendant Lugo has admitted and the extent of Lugo's participation in such illegal conduct and that of others.

---

[9]Rule 404 was last amended on April 17, 2000, amendments that became effective on December 1, 2000.

[10]Given the fact that trial remains to be set, this allegation is **Moot**.

Thus, this certainly enables counsel with adequate notice and opportunity to investigate, prepare and defend.

It is a settled principle that evidence of prior bad acts is inadmissible to show bad character, propensity to commit a crime or that the defendant continues to act in conformity therewith.  However, it may be admissible if it satisfy a two prong analysis:  "First, the past incident must have some relevance other than to show the defendant's propensity to commit the crime.  Second, even if specially relevant, the danger or prejudice can not substantially outweight the probative value of the evidence".  *United States v. Santana*, 342 F.3d 60, 67 (1st Cir., 2003) *citing United States v. Agudelo*, 988 F.2d 285, 287 (1st Cir., 1993).  In other words, the court must determine that: (1) "the evidence must have special relevance to an issue in the case such as intent or knowledge and must not include bad character or propensity as a necessary link in the inferential claim", and (2) "evidence that is specially relevant may still be excluded if it is probative value is substantially outweighted by the danger of unfair prejudice".  *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000), *citing United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996).  As such, prior bad acts may be admitted "to explain the background, formation and development of an illegal relationship."  *Id*, quoting, *United States v. Escobar-de Jesús*, 187 F.3d 148, 169 (1st Cir. 1999).  Also, in determining the probative value of the prior bad act evidence, the court may consider "the remoteness in time of the other act and the degree of resemblance to the crime charged."  *Id* at p. 119, *quoting United States v. Fields*, 871 F.2d 188, 197 (1st Cir. 1989).

The government in opposing defendant's request in limine, asserts that the prior bad conduct is "substantially identical" to the offense charged and "admissible to prove motive, intent, preparation, plan, knowledge and/or absence of mistake or accident."  The government

also contends the prior bad conduct is not dramatically remote, having the bank robbery of Carolina taken place on December 17, 2003 and the one in Hato Rey on November 26, 2004. Since the government asserts that since there is other evidence (surveillance photographs) supporting defendant's participation in prior bank robberies, this fact favors admission of the prior bad acts into evidence.

It is worth noting that the prior bank robberies were similarly planned and executed. During all three episodes, defendant Lugo was accompanied by at least one of the co-defendants (Alex). Though it can not be categorically stated that the crimes were significantly remote, there is no doubt that the charged and uncharged criminal conduct do have unique resemblance. *See*: *United States v. Frankhauser*, 80 F.3d at 648 (1st Cir., 1996) (probative value must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged). Also the fact that at least one of the co-participants in the bank robberies is the same and that their roles have been exchanged over time (at the Banco Bilbao Vizcaya robbery Alex was the leader while at the Aguas Buenas robbery, Lugo was its planner), there is a clear progression from the first to the last bank robbery. *See*: *United States v. Hadfield*, 918 F.2d 987, 994 (1st Cir., 1990) citing *United States v. Flores-Pérez*, 849 F.2d 1, 7 (1st Cir., 1988); *United States v. González-Sánchez*, 825 F2d 572 (1st Cir.) cert. denied, 484 United States 989 (1989) (admitting prior crimes evidence where same participants as in the charged crime are involved).

Accordingly, based on the above-state facts, it is considered that the evidence available to the government is reasonably related and relevant to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident". It is also considered

that the government has provided ample and reasonable notice to defendant Lugo of its intended use.

In considering whether the probative value of prior uncharged criminal conduct, substantially outweighs the danger of unfair prejudice, as outlined in Federal  Rules of Evidence 403, or whether such evidence will tend to confuse the issues or mislead the jury. Courts have made clear "it is only unfair prejudice which must be avoided" *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir., 2000); *United States v. Rodríguez-Estrada*, 877 F.2d 153, 156 (1st Cir., 1989).

In the case at bar, the evidence now available to the government; though prejudicial to defendant, is not of the type that will cause "unfair prejudice", or that will be  shocking or likely to inflame the jury by appealing to its emotions.  Actually, defendant has failed to substantiate the existence of such unfair prejudice or to articulate how, a limiting or cautionary instruction to a jury will not serve to ensure due process.

Thus, it is RECOMMENDED that defendant's Motion in Limine under Federal Rules of Evidence 404(b) be **DENIED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 504.3 of the Local Rules of Court.  Any objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days** of its receipt. Rule 510.1, Local Rules of Court; Fed. R. Civ. P. 72(b).  Failure to timely file specific objections to the Report and Recommendation is a waiver of the right to review by the District Court.  *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir., 1986); *Park Motor Mart, Inc. v. Ford Motor Co*., 616 F.2d 603 (1st Cir., 1980).  The parties are advised that review of a Magistrate-Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de*

*novo* hearing and does not permit consideration of issues not raised before the Magistrate-

Judge.  *Paterson-Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir., 1988).

**SO RECOMMENDED.**

At San Juan, Puerto Rico, this 14th day of October, 2005.

S/**AIDA M. DELGADO-COLON**
**U.S. Magistrate-Judge**